# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................i

PRELIMINARY STATEMENT ......................................................................................2

STATEMENT OF FACTS ...............................................................................................2

RULE 12(c) STANDARD FOR DISMISSAL .................................................................4

      PLAINTIFFS FAIL TO STATE A CLAIM
      PURSUANT TO THE FOURTH
      AMENDMENT. ....................................................................................................5

      PLAINTIFFS FAIL TO STATE A CLAIM
      PURSUANT TO THE FIRST
      AMENDMENT. ..................................................................................................10

      PLAINTIFFS FAIL TO STATE A CLAIM
      PURSUANT TO THE FOURTEENTH
      AMENDMENT. ..................................................................................................13

      PLAINTIFFS' STATE
      CONSTITUTIONAL CLAIM FAILS AS
      THEY DID NOT FULFILL THE
      CONDITIONS PRECEDENT TO SUIT ............................................................16

CONCLUSION ................................................................................................................17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

PHOEBE BERG, TOSHIRO KIDA, JOHN RIVERA, DAYNA ROZENTAL and JOHNATHAN JETTER, individually and on behalf of a class of all others similarly situated,

                                         Plaintiffs,

-against-

NEW YORK CITY POLICE COMMISSIONER RAYMOND KELLY; CHIEF OF NEW YORK CITY POLICE DEPARTMENT JOSEPH ESPOSITO; NEW YORK CITY POLICE DEPARTMENT OFFICERS/SERGEANTS YESENIA AYALA, Sh. No. 13587; BRENDA BATCHER, Sh. No. 18825; MATTHEW BETTING, Sh. No. 12343; CYNTHIA BOYLE, Sh. No. 6663; STEPHEN CAROLAN, Sh. No. 6693; MICHAEL CASALE, Sh. No. 30092; CHRISTOPHER CLARK, Sh. No. 30815; NATHAN COLLINS, Sh. No. 11773; FRANCISCO COSTA, Sh. No. 20660; JESSE COTTON, Sh. No. 1178; CHRIS DEFEO, Sh. No. 19936; JOSEPH DIAZ, Sh. No. 4744; THANYA DUHANEY, Shield No. 5584; JEANETTE FIUEROU, Sh. No. 6040; DEBORAH GARBUTT, Sh. No. 29583; JAMES GATTO, Sh. No. 27905; MATTHEW GRESSWELL, Sh. No. 10994; STEPHEN MAZZARD, Sh. No. 31071; MICHAEL RODER, Sh. No. 25253; DOUGLAS SHEEHAN, Sh. No. 26759; DIXON SU, Sh. No. 7680; PETER VOLAIRE, Sh. No. 27518; JOHN DOES 1-10 (whose identities are currently unknown but who are known to be police officers and/or supervisory personnel of the New York City Police Department); in their individual and official capacities,

                                         Defendants.

------------------------------------------------------------------------- x

**MEMORANDA OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

12 CV 3391 (TPG) (GWG)

      Defendants Raymond Kelly, Joseph Esposito, Yesenia Ayala, Brenda Batcher, Matthew Oetting, a/k/a Matthew Betting, Cynthia Boyle, Stephen Carolan, Michael Casale,

Christopher Clark, Nathan Collins, Francisco Acosta, a/k/a Francisco Costa, Jesse Cottong, Chris Defea, Joseph Diaz, Thanya Duhaney, Jeanette Fiuerou, Deborah Garbutt, James Gatto, Matthew Gresswell, Stephen Mazzard, Michael Roder, Doughlas Sheehan, Dixon Su, and Peter Volaric, ("defendants") by their attorney Michael A. Cardozo, Corporation Counsel of the City of New York, hereby submit this memorandum of law in support of their motion to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs bring this purported class action pursuant to 42 U.S.C. § 1983 against defendants alleging that they were deprived of their Constitutional rights on November 30, 2011. See Amended Complaint, annexed to the March 6, 2013 Declaration of Andrew Lucas ("Lucas Decl.") as Exhibit "A".

Defendants now move to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on the grounds that: 1) plaintiffs fail to state a claim pursuant to the First, Fourth and Fourteenth Amendment; and 2) fails to satisfy the precedents to suit to bring a state claim.

## STATEMENT OF FACTS

On or about April 30, 2012, plaintiffs filed a Complaint against the defendants pursuant to 42 U.S.C. § 1983. See Complaint, generally, Exhibit A. In their Complaint, plaintiffs allege that on November 30, 2011, at approximately 8:00 p.m., they attended a demonstration with approximately 100 other protestors in front of the Sheraton Hotel located on Seventh Avenue between 52nd and 53rd Street. See Exhibit A, ¶¶ 50, 54. The demonstrators selected this location because they knew President Obama would be attending an event at the Sheraton. Id., ¶ 51. Defendants had set up barricades on the sidewalk across Seventh Avenue

from the hotel in a "U" shape in order to give the protestors a place to demonstrate. Id., ¶ 57. According to plaintiffs At approximately 8:41 p.m. defendants allegedly used additional barricades to close the "U" shaped barricade into a rectangle, sealing the demonstrators inside. Id., ¶ 63. Approximately 36 minutes later President Obama arrived and entered the hotel. Id., ¶ 68. At approximately 10:26, one hour and forty-five minutes later, the barricades were opened and the demonstrators were permitted to exit. Id., ¶ 78. During the one hour and forty-five minute time in the frozen zone some Journalists and tourists were permitted to exit the barricades, and pedestrians were moving at the corner of Seventh Avenue and 53rd Street, however pedestrians were not permitted on the sidewalk abutting the Sheraton Hotel. Id., ¶¶ 81-2, 77. No Plaintiffs were arrested in the course of the demonstration. Plaintiffs allege violations of their First, Fourth, and Fourteenth Amendment rights, as well as violations of the New York State Constitution as a result of the placement of the barricades.

Plaintiffs made several statements on social media that indicate they were aware they were in a "frozen" zone while President Obama was in the area. Putative class member Hoa Nguyen stated "'the area is frozen,' an NYPD Community Affairs officer told the Press, even as pedestrians on Broadway were visible behind him. It seemed clear that those who protested were being penalized...." See Twitter statements from putative class members, attached to declaration of Andrew Lucas dated February 28, 2013, as Exhibit B, p. 1. Putative class member John Knefel stated "NYPD just barricaded #dinnerwithBarack group. I'm inside barricades. Not sure if this is kettling or frozen zone." Id., p. 2. He later continued "Now being told we'll be allowed to leave when Obama clears area. Can't confirm." Id., p. 3. Another protestor, identified by the Twitter ID "OWSTactical" published numerous statements while inside the penned area. "53rd St between $6^{th}/7^{th}$ completely clear and blocked off. #OccupyMap #OWS #n30

#dinnerwithBarack." Id., p. 4. "I'm schemin' about sneakin' underneath a barricade.. is that illegal?" Id., p. 5. "We're being boxed in at 53/7 SW. Stay cool people. #occupymap." Id., p. 5. "Free Speech zone has been officially 'frozen' until Obama is all clear. #OWS." Id., p. 6. "… Tweeting from #OWS protest of dinner President #Obama is attending: @johnknefel [John Knefel] @DiceyTroop." Id., p. 7 "#MicCheck: 'Secret Service has shut down the entire area. Once they're done doing what they're doin, hopefully they'll let us go' #hopefully." Id., p. 7.

## RULE 12(c) STANDARD FOR DISMISSAL

In deciding a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the court is to "apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." King v. Am. Airlines, Inc., 284 F.3d 352 (2d Cir. 2002) (quoting Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999)).

A complaint may be dismissed pursuant to Rule 12(b)(6) where it fails to plead "enough facts to state a claim to relief that is plausible on its face." See Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1975 (2007). In order to state a claim, the factual allegations contained in the pleading "must be enough to raise a right to relief above the speculative level." See Twombly, 127 S. Ct. at 1965; see also In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007) ("While Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'"). A complaint satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Evaluating the sufficiency of a complaint is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." See id. at 1950. The Court may and should disregard "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Id. at 1949. After examining the remaining factual matter, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' – 'that the pleader is entitled to relief.'" See id. at 1950 (quoting Fed. R. Civ. P. 8(a)).

"On a motion to dismiss, a court is not limited to the four corners of the complaint; a Court may also consider documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." In re: Beacon Associates Litigation, 745 F.Supp.2d 386, 402 (S.D.N.Y. 2010)(quotations omitted); citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993)(the court may rely upon "documents submitted by the moving party, so long such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings".)

For the reasons set forth herein, plaintiff's claims under the First, Fourth and Fourteenth Amendment of the United States Constitution and under the New York State Constitution should be dismissed with prejudice.

## ARGUMENT

### POINT I

#### PLAINTIFFS FAIL TO STATE A CLAIM PURSUANT TO THE FOURTH AMENDMENT.

The Fourth Amendment enshrines "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "As the Fourth Amendment's text makes clear, the concept of reasonableness is the 'touchstone of the constitutionality of a governmental search.'" Macwade v. Kelly 460 F.3d 260, 267-8 (2d Cir. 2006). The analysis for 'reasonableness,' outside the warrant or probable cause analysis, is known as the 'special needs' exception. Id., 268.

The special needs exception requires that a search "serve as [its] immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation." Nicholas v. Goord, 430 F.3d 652, 663 (2d Cir. 2005). Where there is a distinct objective, the Court balances the reasonableness of the search based upon 1) the weight and immediacy of the government interest; 2) the nature of the privacy interest allegedly compromised ; 3) the character of the intrusion imposed by the search; and 4) the efficacy of the search in advancing the government interest. Macwade, 460 F.3d 269; *citing* Nicholas, 430 F.3d 669-70; Bd. Of Educ. v. Earls, 53 U.S. 822, 830, 32, 34 (S. Ct. 2002).

As a threshold matter, this case does not present any opportunity to gather evidence associated with crime investigation. No search of plaintiffs is alleged and the objective in this case is clearly distinct from gathering evidence in any criminal investigation.

A balancing test has been employed that more accurately captures the considerations where, as here, there is a seizure, but no search. "[T]here are exceptions to the warrant requirement for cases where a search serves special governmental needs 'beyond the normal need for law enforcement.' In such cases the reasonableness of a search is determined by balancing 'the public interest [] against the privacy concerns implicated [], without reference to the usual presumption in favor of the procedures specified in the Warrant Clause.'" Stigile v.

Clinton, 110 F.3d 801, 803 (D.C. Cir. 1997); *citing* National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665, 679 (S. Ct. 1989); Skinner v. Railway labor Executives' Ass'n, 489 U.S. 602, 619 (S. Ct. 1989).

In this case there are two distinct, but related government interests the security of the President of the United States, and security of the area more generally. As is immediately evident "the protection of the President and the Vice President... is clearly 'beyond the normal need for law enforcement.'" Stigile, 110 F.3d 803. "Clearly, protection of the President is a compelling, even an overwhelming interest[.]" Sherril v. Knight, 569 F.2d 124, 130 (D.C. Cir. 1977). "Few events debilitate the nation more than the assassination of a President. The Supreme Court has recognized the importance of this interest. In Watts v. United States, the Court said, 'the Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." Stigile, 110 F.3d 803-4; *citing* Watts v. United States, 394 U.S. 705, 707 (S. Ct. 1969); White House Vigil for ERA Comm. v. Watt, 230 U.S. App. D.C. 291 (D.C. Cir. 1983) ("The balance that must be struck between First Amendment rights and other public interests is especially delicate when one of those interests is the safety of the President.");

In addition to the 'overwhelming' government interest in Presidential security, more general security concerns, particularly in the context of a demonstration, present compelling government interests. The Court has held that "[t]he government interest in security is [] significant... [N]o express threat or special imminence is required before we may accord great weight to the government's interest in staving off considerable harm. All that is required is that the 'risk to public safety [be] substantial and real instead of merely symbolic." Marcavage

v. City, 689 F.3d 98, 105 (2d Cir. 2012) (quotations omitted); *citing* Macwade, 460 F.3d 272; Chandler v. Miller, 520 U.S. 305, 322-323 (S. Ct. 1997).

Further, security necessarily deals with potential threats "[S]ecurity protocols exist to deal with hypothetical risks and security planning is necessarily concerned with managing potential risks which sometimes necessitates consideration of the worst-case scenario… a designed security protocol reduces a plausible and substantial safety risk, it directly and effectively advances a substantial government interest. The government's judgment as to the best means for achieving its legitimate objectives deserves considerable respect." Marcavage, 689 F.3d 105 (quotations omitted); *citing* Citizens for Peace in Space, 477 F.3d. 1224; Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 13 (1st Cir. 2004).

Even where outwardly peaceful, "it is appropriate for governments to consider possible security threats and the role that protesters may play in causing such threats or inadvertently preventing the authorities from thwarting or responding to such threats." Marcavage, 689 F.3d 105 (quotations omitted); *citing* Citizens for Peace in Space v. City of Colo. Springs, 477 F.3d 1212, 1223-24 (10th Cir. 1997)("It was not impermissible for the City to draw a distinction between residents… in the security zone and those seeking to protest… the City made a reasonable assumption that protestors could pose more of a security risk to the conference than other persons, an assumption that… finds some support given the violent protests surrounding the World Trade Organization meeting in Seattle").

In the case at bar, the Fourth Amendment was only violated if the interest of the protestors in not remaining in a confined area for two hours is unreasonable when weighed against the "valid, even [] overwhelming interest in protecting the safety of [the] Chief Executive" and the considerable security concerns raised by the demonstration. Watts, 394 U.S.

707. <u>Stigile</u> is illustrative on this point: <u>Stigile</u> considered the Fourth Amendment rights of federal employees to avoid urinalysis drug testing based upon their working in a building next to the White House. The Court held that a drug user "could be vulnerable to bribery or intimidation... [or] could be blackmailed into using his access to the building to assist in an attack on the President. Given the importance of protecting the President's safety, this is all that is required to make this particular search reasonable. It therefore does not violate the Fourth Amendment." 110 F.3d 806. A thoroughly speculative harm still does not amount to a Fourth Amendment violation, despite the plaintiffs "serious and legitimate privacy interest." <u>Stigile</u>, 110 F.3d 804. This is particularly true where the harm sought to be avoided is great and the potential damage "irreparable." <u>Stigile</u>, 110 F.3d 806. The purely speculative risk to the President outweighs any privacy interest in plaintiffs' own bodily fluids.

Laying out the public interests at stake against the privacy concerns implicated makes plain that there is no actionable claim here. Presidential security is an overwhelming interest. Security is a compelling interest, and one heightened by the presence of protestors. These cannot be outweighed by remaining for less than two hours remaining in an area the plaintiffs voluntarily entered in order to protest. The underlying goal of the frozen zone where plaintiffs were allegedly held was the safety of the President, as stated by the protestors themselves. <u>See</u> Exhibit B. They were not held at that location until the president arrived. <u>See</u> Exhibit A, ¶¶ 63, 68. Plaintiffs were not subjected to any search. They were not handcuffed. They were merely required to remain for less than two hours at the location they had chosen to protest in, across the street from the President and their stated goal "#dinnerwithBarack." This inconvenience must be weighed against any potential, even speculative harm to the President and security. It is readily apparent that the government interest is overwhelming in this case.

Coupled with the fact that protests present unique security concerns, the defendants' actions as alleged by plaintiffs cannot be seen to be anything but reasonable. Plaintiffs wanted to be close to the President, and to the credit of the New York City Police Department they were allowed to march to across the street from his destination and remain there through his visit. That plaintiffs had to wait for the President to leave before being allowed to exit the pens owes to their zeal in marching to a location inside the 'frozen zone' established by the police, and an overwhelming interest in Presidential security. As defendants' actions were plainly reasonable in the face of unique security concerns and a risk of debilitating harm to the whole nation, and their invasion of plaintiffs' privacy interests minimal at best, plaintiffs' claims under the Fourth Amendment must be dismissed.

## POINT II

### PLAINTIFFS FAIL TO STATE A CLAIM PURSUANT TO THE FIRST AMENDMENT.

Plaintiffs argue that their rights to free speech, association and assembly were violated by the approximately two hours spent within the barricades at Fifty-Third and Seventh Avenue. The plaintiffs make no claim regarding any restrictions on content of their speech. Instead they claim that the use of metal barricades at the November 30, 2011 protest restricted where they were allowed to demonstrate. As such it is best characterized as a time, place and manner restriction.

In analyzing a First Amendment claim regarding a time place and manner restriction the Court weighs "1) whether Plaintiffs were engaged in First Amendment protected activity 2) in a traditional public forum, and 3) if the restriction on speech was unrelated to

content." Marcavage, 689 F.3d 103; *citing* Ward v. Rock Against Racism, 491 U.S. 781, 790-91 (1989).

Defendants concede that plaintiffs were engaged in First Amendment protected protesting or picketing. Frisby v. Schultz, 487 U.S. 474, 479 (1988). Defendants further concede that the sidewalks of New York City are "traditional public for[a.]" Marcavage, 689 F.3d 104; *citing* Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 377 (1997). Finally, the restriction on plaintiffs' speech was content neutral. "A regulation is content neutral when it is 'justified without reference to the content of the regulated speech.'" Marcavage, 689 F.3d 104; *citing* City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986). The restriction at issue in this case is not alleged to be anything but content neutral as expressive speech was not alleged to have been permitted outside of the pen at issue in this case. Nowhere else inside the frozen zone was expressive speech permitted. The restriction was in no way content based, and plaintiffs inside the pen in fact had no restriction on their speech save the location of it.

First Amendment analysis turns next on whether restrictions "1)  are justified without reference to the content of the regulated speech, 2) ... are narrowly tailored to serve a significant governmental interest, and 3) ... leave open amply alternative channels for communication of the information." Marcavage, 689 F.3d 104; *citing* Ward, 491 U.S. 791; Clark v. Cmty for Creative Non-Violence, 468 U.S. 288, 293 (1984).

As discussed above the restriction at issue was content neutral and justified without reference to content. Additionally, as discussed above, the governmental interests at stake were of the most sobering and critical nature. Presidential security as discussed is a valid and overwhelming governmental interest. Watts, 394 U.S. 707; Moss v. United States Secret Serv., 2013 U.S. App. LEXIS 4112, 38-39 (9th Cir. Or. Feb. 26, 2013) *citing* Hunter v. Bryant,

502 U.S. 224, 229 (1991) ("To be sure, the government interest at stake — the protection of the President — is of the highest significance."). General security concerns are afforded "great weight," even where they deal with "hypothetical risks." Marcavage, 689 F.3d 105. Both of these concerns are heightened as a matter of law by the presence of protester. Marcavage, 689 F.3d 105. And "'the [G]overnment's judgement as to the best means for achieving its legitimate objectives deserves considerable respect.'" Marcavage, 689 F.3d 105; citing Ward, 491 U.S. 798-99.

Additionally the governmental action in this case was narrowly tailored. "A regulation is narrowly tailored so long as [it] promotes a substantial government interest that would be achieved less effectively absent the regulation….and is not substantially broader than necessary to achieve the government's interest." Marcavage, 689 F.3d 106; citing Ward, 491 U.S. 799-800.

The regulation at issue in this case was a less than two hour restriction on incoming sidewalk traffic. It also limited demonstration to a small area where demonstrators had already congregated inside the frozen zone. The plaintiffs in this case were permitted to defy the frozen zone as it was conceived for presidential security and to march across the street from where the President would be arriving. The regulation at issue is not only narrowly tailored but in fact exceedingly permissive, and a credit to the New York City Police Department for showing flexibility to accommodate the Plaintiff's First Amendment Rights in the context of a heightened security scenario. It is pure speculation what would have come to pass if the Police in this situation attempted to stop the protestors at the limits of the frozen zone, however, to the benefit of the plaintiffs First Amendment rights they were instead allowed to gather at a spot in the plain line of sight and sound of the president as he entered his event.

Finally, a regulation must leave open "ample alternative channels for communication of the information…. In this Circuit, an alternative channel is adequate and therefore ample if it is within 'close proximity' to the intended audience" Marcavage, 689 F.3d 106; citing Ward, 491 U.S. 791; United for Peace & Justice, 323 F.3d 175, 177 (2d Cir. 2003).

In United for Peace & Justice, a permit was granted for a location across a major avenue and two blocks away from the protestors desired location, the entrance to the United Nations. United For Peace, 323 F.3d 177. The location two blocks and across an avenue away was both close proximity and permissible under First Amendment. United for Peace, 323 F.3d 177.

In this case, as discussed above, Plaintiffs were permitted to march to a location across the street from the President when he arrived. They were within sight and sound of the President's arrival, they were only across an Avenue. Plaintiffs got their #dinnerwithBarrack. As such, there is no question that whatever alternative channel Plaintiffs could propose, it was not necessary. Plaintiffs were just a few lanes of traffic over from the President of the United States.

As Plaintiffs' had no restriction on their speech save the location, and they were permitted to march and protest within a few lanes of traffic of the President, there was no First Amendment violation in this case. As such Plaintiffs' claims under the First Amendment must be dismissed.

### POINT III

### PLAINTIFFS FAIL TO STATE A CLAIM PURSUANT TO THE FOURTEENTH AMENDMENT.

Plaintiffs' claim that their right to due process and equal protection afforded by the Fourteenth Amendment were violated by their time inside the barricades. See Exhibit A, ¶ 113-14, 118-19. They also reference the chilling effect on their First Amendment rights. Id. At the outset, Plaintiffs fail to plead violations under the Fourteenth Amendment.

> "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 129 S.Ct 1937, 1950 (2009).

As stated above it is unclear what Fourteenth Amendment rights plaintiffs are claiming relief under. Plaintiffs' claim alleging an equal protection and due process violation cite to the Fourteenth Amendment, and briefly contemplate detention and the First Amendment, but ultimately do not outline the basis, or underlying request for relief. As such, where Plaintiffs seek relief pursuant to the Fourteenth Amendment, these claims should be dismissed as legal conclusions, unsupported in their underlying basis. To the extent they reference detention and the First Amendment, then the Fourth and First Amendment, as discussed above, should govern.

Under a due process analysis "the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Michaelidis v. Berry, 2012 U.S. App. Lexis 23277, *5 (2d Cir. 2012). "Generally speaking, [f]or state action to be taken in violation of the requirements of substantive due process, the denial must have occurred under circumstances warranting the labels arbitrary and outrageous." Kuck v. Danaher, 600 F.3d 159, 167 (2d Cir. 2010); *citing* Rochin v. California, 342 U.S. 165, 172, (1952), *overruled on other grounds by* Mapp v. Ohio, 367 U.S. 643, (1961); Natale v. Town of Ridgefield, 170 F.3d 258, 262 (2d Cir. 1999).

As outlined by plaintiff, that right included the right to liberty and their First Amendment rights. As discussed above, those rights were not violated, and certainly not in any manner that could warrant the label arbitrary or outrageous.

"To prove a selective enforcement claim, a plaintiff must demonstrate that laws were not applied to him as they were applied to similarly situated individuals and that the difference was intentional and unreasonable." Deegan v. City of Ithaca, 444 F.3d 135, 146 (2d Cir. N.Y. 2006); *citing* Village of Willowbrook v. Olech, 528 U.S. 562, 564, (2000); Harlen Assocs. v. Inc, Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). "[E]qual protection claims under § 1983 cannot be based solely on the disparate impact of a facially neutral policy. It is well established that [p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Therefore, a plaintiff pursuing a claimed violation of § 1981 or a denial of equal protection under § 1983 must show that the discrimination was intentional." Reynolds v. Barrett, 685 F.3d 193, 201 (2d Cir. 2012); (quotations omitted); *citing* Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004); City of Cuyahoga Falls v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194, (2003) Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265, (1977); Hayden v. Paterson, 594 F.3d 150, 162 (2d Cir. 2010).

To the extent plaintiffs have pled an equal protection claim, that claim necessarily fails as they cannot show that the facially neutral policy to contain the demonstrators in the frozen zone had any underlying discriminatory intent or purpose. Additionally, plaintiffs cannot point to any similarly situated individuals, engaged in political speech inside the frozen zone, and finally, in the context of a Presidential visit, defendants actions were reasonable as discussed

above.

## POINT IV

### PLAINTIFFS' STATE CONSTITUTIONAL CLAIM FAILS AS THEY DID NOT FULFILL THE CONDITIONS PRECEDENT TO SUIT.

"No action . . . shall be prosecuted or maintained against the city . . . or any employee . . . unless a notice of claim shall have been made and served upon the city." N.Y. Gen. Mun. L. § 50-i(1). Additionally a claim against New York City or its employees must be "commenced within one year and ninety days after the happening of the event upon which the claim is based." N.Y. Gen. Mun. L. § 50-i(1).

This requirement includes claims under the New York State Constitution. "both the present action and any action that could be pleaded under the State Constitution are barred by plaintiff's failure to give the required notice of claim" 423 South Salina Street, Inc. v. Syracuse, 68 N.Y.2d 474, 482 (N.Y. 1986). "[T]he plaintiff's second cause of action, which asserts a violation of his constitutional rights under State law, is barred by his failure to serve a timely notice of claim upon the school district" Bidnick v. Johnson, 253 A.D.2d 779, 780 (N.Y. App. Div. 1998).

Plaintiffs must both comply with the requirements of G.M.L § 50-i and also plead compliance. G.M.L. § 50-i(1)(b). In this case Plaintiffs have failed to plead compliance with the notice of claim requirement, and failed to timely serve a notice of claim. As over one year and ninety days have passed, they cannot be permitted to amend this claim. As such plaintiffs claim under the New York State Constitution should be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons defendants respectfully request that the Court dismiss plaintiffs' complaint with prejudice, and grant such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           March 6, 2012

                                        MICHAEL A. CARDOZO
                                        Corporation Counsel of the City of New York
                                        *Attorney for Defendants*
                                        100 Church Street
                                        New York, New York 10007
                                        212-788-1273

                                        By:    _____
                                               Andrew Lucas
                                               Assistant Corporation Counsel
                                               Special Federal Litigation Division