UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
                               :

PHEOBE BERG, *et al.*,              :

                               :

               Plaintiffs,    :

                               :          12-cv-3391 (TPG)

                v.                 :

                               :         **OPINION**

NEW YORK CITY POLICE COMMISSIONER :
RAYMOND KELLY, *et al.*,       :

                               :

               Defendants.   :

                               :

------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/10/16

This putative class action arises out of an Occupy Wall Street protest during President Barack Obama's November 2011 visit to New York City. Plaintiffs were protestors who were allegedly deprived of their federal and state constitutional rights when New York Police Department ("NYPD") officers detained them in a barricaded area for over an hour. Defendants, NYPD officers at the time of the protest, now move for summary judgment on all claims. For the following reasons, defendants' motion for summary judgment is granted in part and denied in part.

## Background

Drawing all reasonable inferences in plaintiffs' favor, a reasonable jury could find the following facts to be true. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014).

On November 30, 2011, a protest took place in Manhattan as part of the Occupy Wall Street movement. Scores of protestors gathered at

Bryant Park in the early evening. Their plan was to march through Midtown toward a fundraising event attended by President Obama at the Sheraton Hotel, located at Seventh Avenue between 52nd and 53rd Streets. Their goal, rhetorically, was to "#OccupyObama" and have "#DinnerWithBarrack" by protesting outside the Sheraton. *See* Rozental Dep. 16:18–17:4.

As the protestors neared the President's event, they stopped briefly one block south of the Sheraton, at the corner of Seventh Avenue and 51st Street. The NYPD had previously designated this corner as a "protest area." Some protestors briefly discussed remaining in the protest area, but, ultimately, they continued northward on their march.

Because police officers had restricted some pedestrian traffic around the Sheraton, the protestors could not walk up Seventh Avenue. Instead, a group of between 50 and 200 protestors proceeded north on Broadway, turned right on 53rd Street, and finally came to the southwest corner of Seventh Avenue and 53rd Street, opposite the Sheraton. In plans made prior to the presidential visit, the NYPD had designated this area as a "press pen"—that is, an area where members of the media could await the President's arrival at the Sheraton.

By the time the protesters got to the press pen at approximately 8:00 p.m., police barricades already flanked the curb along 53rd Street and at the southwest corner of Seventh Avenue and 53rd Street. The effect was to create a U-shaped barricaded area that was enclosed on

three sides.   Police officers ushered the protestors into this barricaded area.   *See* Hart Dep. 46:24–47:9, 47:25–48:12; Latalardo Dep. 41:23–42:2, 43:11–15.

Shortly before the President's 8:50 p.m. arrival at the Sheraton, the NYPD established a "frozen zone" to restrict pedestrian traffic around the hotel.   The zone extended from Sixth Avenue to Broadway and from 52nd Street to 53rd Street.   It therefore included the entire press pen, even though that location ███████████████████████████████████████████████

████████████████████████████████████   *See* Purtell Dep. 60:17–63:4;

███████████████████████████████████.

At some point, police officers placed additional barricades behind the protesters on 53rd Street, thereby closing the press pen on all four sides.   *See* Berg Dep. 43:3–17.   Defendants have not been able to identify who ordered this closure, and it is unclear whether it occurred before or after the President's arrival.   The protestors repeatedly asked to leave the press pen, but police officers repeated refused their requests.   Some police officers even threatened to arrest protestors who tried to leave. *See* Jetter Dep. 41:8–11.   Police officers did, however, allow tourists and journalists to leave the press pen, and traffic flowed freely on Seventh Avenue between the Sheraton and the press pen.   *See, e.g.,* Jetter Dep. 38:18–39:19; Rozental Dep. 42:15–16; Dkt. 110, Video Ex. 12 at 0:40 and 4:10.   When protestors asked why they alone were being detained,

police officers told them it was "for being a protestor." Dkt. 110, Video Ex. 13 at 4:30; *see also* Jetter Dep. 41:12–16.

The President left the Sheraton at 10:25 p.m., and police officers released the protesters from the press pen soon after. The detention had lasted for over an hour.

Following these events, plaintiffs, who were all part of the protest, filed a complaint alleging claims under 42 U.S.C. § 1983 for violations of the First, Fourth, and Fourteenth Amendments of the U.S. Constitution, as well as parallel claims under the New York State Constitution. Plaintiffs brought this case as a class action on behalf of themselves and all other persons who were detained in the press pen. In November 2013, the court denied defendants' motion for judgment on the pleadings. After plaintiffs amended their complaint, defendants moved for summary judgment on all claims.

## Discussion

Summary judgment is proper only "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And an issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255. The court must "believe[]" the nonmovant's evidence and draw "all justifiable inferences . . . in his favor." *Id.* "[I]f there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (citation and alteration omitted). In sum, the court may grant such relief only "if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

## I.   Federal Constitutional Claims

Plaintiffs have brought federal constitutional claims for violations of the First, Fourth, and Fourteen Amendments under 28 U.S.C. § 1983, which "creates a cause of action against any person who, acting under color of state law, abridges 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *See Shakhnes v. Berlin*, 689 F.3d 244, 250 (2d Cir. 2012) (quoting 42 U.S.C. § 1983). Defendants move for summary judgment on all claims.

### a. *Kelly and Esposito's Personal Involvement*

As a threshold matter, defendants Raymond Kelly and Joseph Esposito argue that claims against them fail due to lack of personal involvement. "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). A defendant in a § 1983 action may not be held liable merely because he holds a high position of authority. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

At the time of the protest, Raymond Kelly was the Commissioner of the NYPD and Joseph Esposito was the Chief of Department of the NYPD. The amended complaint barely mentions either defendant, and it is undisputed that neither was at the scene of the protest. In their opposition brief, plaintiffs belatedly raise theories of supervisory liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and of *respondeat superior*, but they failed to plead either theory even after amending their complaint. Given the evidence in the record, no reasonable jury could find that defendants Kelly and Esposito were sufficiently involved in this incident to establish liability under § 1983.

In sum, plaintiffs' § 1983 claims fail as to defendants Kelly and Esposito for lack of personal involvement in the alleged constitutional

deprivations.[1]    The court will now consider claims as to all other

defendants.

### b. *Plaintiffs' Fourth Amendment False-Arrest Claim*

Plaintiffs claim that their detention constituted a false arrest in

violation of the Fourth Amendment.  A claim for false arrest "resting on

the Fourth Amendment right to be free from unreasonable seizures . . . is

substantially the same as a claim for false arrest under New York law."

*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).

Under New York law, a plaintiff must satisfy four elements: "(1) the

defendant intended to confine the plaintiff, (2) the plaintiff was conscious

of the confinement, (3) the plaintiff did not consent to the confinement,

and (4) the confinement was not otherwise privileged." *Bernard v. United

States*, 25 F.3d 98, 102 (2d Cir. 1994).  Defendants concede the first

three elements.

Where police detain someone without a warrant, a presumption

arises that the detention was unlawful and the burden shifts for proving

privilege to confine. *See Jenkins v. City of New York*, 478 F.3d 76, 88 (2d

Cir. 2007).  Defendants here do not claim to have had a warrant to

detain the protestors, nor do they attempt to establish probable cause for

the detention.  In fact, defendants freely admit that police officers knew

---

[1] In their reply brief, defendants raise for the first time the argument that claims against defendants James McNamara and Peter Loehle also fail for lack of personal involvement. "Arguments made for the first time in a reply brief need not be considered by a court," and the court declines to consider them here.  *See Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997).

of no specific threats to the President that night and that officers did not observe the protestors threatening any violence or criminal activity in the press pen. *See* Latalardo Dep. 47:22–24, 48:10–14; Hart Dep. 58:8–14, 93:11–13; Purtell Dep. 66:24–67:3, 72:6–9.

Defendants' principal argument is that their actions were essential to ensure the President's safety. They also argue that large groups of protestors necessarily pose enhanced security risks. To cast this in more legalistic terms, defendants assert that "special needs" associated with the President's visit privileged their actions.

It may be true that certain circumstances justify police officers temporarily detaining people to protect the President, and that large crowds may sometimes pose higher risks. But even defendant Peter Loehle, the NYPD sector commander for the area encompassing the Sheraton, admitted that he was unaware of any reason why his officers closed the press pen on four sides and detained the protestors within. Loehle Dep. 65:11–15, 66:19–24. He also testified that he was unaware of any reason why his officers had failed to follow the written NYPD policy of allowing protestors "to leave the barrier area at any time." Loehle Dep. 110:5–16.

To be sure, defendants set forth an array of *possible* justifications for the detention, chief among them the undoubted importance of ensuring the President's security. But defendants fail to identify who gave the order to detain the protestors, thereby obscuring the actual

reason for the detention. Moreover, circumstantial evidence casts doubt on defendants' purported justifications, particularly the fact that police officers froze the press pen even though ███████████████████

████████████████████████████████████████████████

███████████████. *See* Purtell Dep. 60:17–63:4; Loehle Dep. 65:4–10, 66:19–24; ████████████. All this uncertainty provides a genuine issue of material fact for the jury to decide as to *why* the protestors were detained. Without making this factual determination, it is impossible to assess defendants' claimed privilege.

In sum, the evidence in the record could allow a reasonable jury to find that such a detention violated the Fourth Amendment. For example, a reasonable jury could conclude that police officers singled out the protestors for detention *because they were protestors*—as opposed to journalists or tourists—and that the officers had impermissible motives when they did so. Of course, a jury might *not* draw these inferences in plaintiffs' favor at trial, but they are still the jury's inferences to draw.

Accordingly, defendants have failed to show that they are entitled to summary judgment on plaintiffs' Fourth Amendment false-arrest claim.

c. *Plaintiffs' First Amendment Retaliation Claim*

Plaintiffs allege that their detention also violated the First Amendment because it was retaliation for their protest and their association with Occupy Wall Street. To establish a claim for First

- 9 -

Amendment retaliation, a plaintiff must satisfy three elements: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). The injury need not be chilled speech, which "is not the *sine qua non* of a First Amendment claim," and a plaintiff may prevail "if he can show *either* that his speech has been adversely affected by the government retaliation *or* that he has suffered some other concrete harm." *Id.* (third emphasis added)

As to the first element, it is undeniable that the First Amendment protects the right to engage in peaceful protest directed at the President. *See, e.g., Watts v. United States*, 394 U.S. 705, 708 (1969). And as to the third element, the alleged injury is the detention itself, which clearly constitutes a "concrete harm." *See generally Gill v. Pidlypchak*, 389 F.3d 379, 381–84 (2d Cir. 2004). The key dispute, then, concerns the second element: whether the officers' actions were motivated or substantially caused by the protestors' exercise of their First Amendment rights. In short, was there a causal connection between the speech and the detention?

Circumstantial evidence of retaliatory intent may supply the causal connection between a plaintiff's protected speech and a defendant's adverse action. *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). As discussed above, there exists a genuine issue of material fact as to

why the protestors were detained, and a reasonable jury could find that it was simply "for being a protestor." *See* Dkt. 110, Video Ex. 13 at 4:30. Not only did police officers at the scene allegedly make statements to that effect, but they also allowed journalists and tourists to leave the press pen while refusing similar requests from the protestors. Moreover, the press pen was ███████████████████████████████████████ ████████████████████, yet police officers unquestionably prevented protestors from leaving.

In short, because the court cannot glean from the record what actually motivated police officers to detain the protestors, defendants cannot show they are entitled to summary judgment on plaintiffs' First Amendment retaliation claim.

d. *Plaintiffs' Fourteenth Amendment Selective-Enforcement Claim*

Plaintiffs also claim that defendants subjected them to selective enforcement, in violation of the Fourteenth Amendment's guarantee of equal protection. To establish a claim for selective enforcement, a plaintiff must satisfy two elements: "(1) that the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (alteration and citation omitted). "Generally, whether two entities are similarly situated

is a factual issue that should be submitted to the jury." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007)

Here, as detailed above, a genuine issue of material fact exists as to the actual reason for detaining the protestors. A reasonable jury could find that plaintiffs satisfy both elements of a selective-enforcement claim by crediting evidence that police officers detained protestors due to their protected speech. The protestors were certainly "treated differently" from other people near the Sheraton that night. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). While the protestors were confined to the press pen, others were allowed to leave, and traffic moved freely along Seventh Avenue between the detained protestors and the President's event.

Defendants argue that this claim must fail because plaintiffs "cannot identify other groups consisting of scores of protestors who eschewed a designated protest area, attempted to approach the president, and supplanted a designated area across the street from the President." Dfs.' Mem. L. at 15. This degree of extreme similarity is unrealistic and unnecessary. Rather, "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent." *Penlyn Dev. Corp. v. Inc. Vill. of Lloyd Harbor*, 51 F. Supp. 2d 255, 264 (E.D.N.Y. 1999). "Exact correlation is neither likely nor necessary." *Id.*

More importantly, the protestors' status *as protestors* cannot distinguish them and thereby establish that no one at the scene was similarly situated.   Were that sufficient, the second element of a selective-enforcement claim would be nonsensical in many cases, as this simple hypothetical reveals.  Imagine two people at a parade.  The first is a vocal woman who is enthusiastically exercising her constitutional rights by chanting political songs; the second is a silent man who is simply watching the parade pass by.   Police officers force the vocal woman to leave the parade but do nothing to the silent man.   Under defendants' theory, the officers could admit that they targeted the vocal woman "to inhibit or punish the exercise of [her] constitutional rights," *Freedom Holdings*, 357 F.3d at 234, but still prevail by showing that she was the only one exercising those rights.  That is not the law of selective enforcement.

Given the disputed factual issues that endure, defendants cannot obtain summary judgment plaintiffs' Fourteenth Amendment selective-enforcement claim.[2]

e. *Plaintiffs' Failure-to-Intervene Claim*

In conjunction with their First, Fourth, and Fourteenth Amendment claims, plaintiffs bring a separate claim alleging that

---

[2] Plaintiffs' opposition brief explicitly cabins their Fourteenth Amendment claim to a theory of equal protection and fails to respond to defendants' arguments as to the due-process claim found in plaintiffs' amended complaint.   It appears, therefore, that plaintiffs have abandoned any claim based on the Fourteenth Amendment's guarantee of due process.

defendants failed to intervene during the detention.   Even where an officer did not personally effect an arrest, he may be held liable for failing to intervene where "that officer observes or has reason to know . . . that a citizen has been unjustifiably arrested" or "that any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Given the material factual disputes that remain, defendants cannot obtain summary judgment on plaintiffs' claim for failure to intervene.  If the jury credits plaintiffs' evidence, defendants James McNamara, Peter Loehle, and Stephen Latalardo could all be liable for failing to protect plaintiffs' constitutional rights.   Defendant McNamara was the NYPD officer who had command of the area surrounding the Sheraton on the night of the protest, and other officers testified that he likely knew of the orders to hold the protestors.  *See* Purtell Dep. 37:23–39:3, 39:18–41:12. Defendant Loehle was the NYPD sector commander for the area encompassing the Sheraton, and there is evidence suggesting he was in charge of carrying out the order to freeze the area that included the press pen.  *See* Hart Dep. 56:15–57:24.  Finally, defendant Latalardo admits he might have been the officer who actually closed the press pen, and that he was the one who opened it after the President's departure.   *See* Latalardo Dep. 41:10–22, 43:16–20, 46:3–5.  Taken together, these facts, which a reasonable jury could find, could show that each officer failed to act despite knowing or having reason to know that the protestors had

been "unjustifiably" detained or that a fellow officer had committed a "constitutional violation." *See Anderson v. Branen*, 17 F.3d at 557.

Accordingly, defendants have failed to show that they are entitled to summary judgment on plaintiffs' claim for failure to intervene.

f. *Defendants' Qualified-Immunity Defense*

Defendants invoke qualified immunity as to all of plaintiffs' § 1983 claims.    Qualified immunity shields officials from liability for civil damages to the extent their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).    "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

If the law is "clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818–19.  That is not to say that "the very action in question [must have] previously been held unlawful." *Id.*  Rather, so long as the unlawfulness is "apparent" in light of "pre-existing law," public officials "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002) (citations omitted).

The parties fiercely dispute the true motivation for the detention. Although defendants now invoke presidential security, plaintiffs allege

that something more sinister led police officers to single out the protestors for different treatment that night. "Where the objective reasonableness of state action depends on credibility determinations, a genuine issue of material fact precludes summary judgment" on the issue of qualified immunity. *Santulli v. Russello*, 519 F. App'x 706, 709 (2d Cir. 2013) (citing *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007)). Here, the court cannot assess defendants' purported immunity without wading into factual disputes that must be left for a jury.

If a jury were to credit plaintiffs' evidence, clearly established law at the time of their detention could support each of their § 1983 claims. A reasonable jury could find that police officers detained the protestors, without probable cause or a warrant, due to a motive that belies defendants' claimed privilege. This the Fourth Amendment clearly would not permit. *See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."). A reasonable jury could also find that the protestors were detained as retaliation for their association with Occupy Wall Street. This the First Amendment clearly would not permit. *See Santulli*, 519 F. App'x at 708–09 ("It is clearly established that a person has the right to be free from retaliation for an exercise of First Amendment rights."). And a reasonable jury could find that police officers selectively treated the protestors in order to punish them for their speech. This the Fourteenth

- 16 -

Amendment clearly would not permit.  *See Burns v. Citarella*, 443 F. Supp. 2d 464, 470 (S.D.N.Y. 2006) ("It is [] clearly established that selective enforcement . . . based on an official's dislike of protected expression is unlawful.").  Finally, having made these findings, a reasonable jury could conclude that police officers violated clearly established rights by failing to intervene when they knew or should have known of the detention.  *See Anderson v. Branen*, 17 F.3d at 557 ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

For these reasons, defendants have failed to show that they are entitled to qualified immunity.

## II.    State Constitutional Claims

Plaintiffs also plead various state constitutional claims, which defendants argue must be dismissed because adequate alternative remedies exist.  Where a plaintiff has alternate remedies available under a federal statute such as 28 U.S.C. § 1983, "her state constitutional tort claim is redundant and precluded." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013).  Plaintiffs' opposition ignores this argument raised by defendants, yet the principle is sufficient to defeat the state constitutional claims as a matter of law.

The court therefore grants defendants' motion for summary judgment as to these claims.

## Conclusion

On a motion for summary judgment, the movant faces a demanding standard if the court is to deprive the nonmovant of a jury determination.   Defendants have met their burden on plaintiffs' state constitutional claims, but have failed to do so on plaintiffs' federal constitutional claims, except as to defendants Kelly and Esposito. Accordingly, the motion for summary judgment is granted in part and denied in part.

SO ORDERED

Dated:  New York, New York
        August 10, 2016

Thomas P. Griesa
U.S. District Judge